

**TAX COURT OF NEW JERSEY**

**JOSHUA D. NOVIN**
**Judge**

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS**

August 2, 2024

Robert E. Spiotti, Esq.
Spiotti & Associates, P.C.
612 Godwin Avenue
Midland Park, New Jersey 07432

Dominic DiYanni, Esq.
Eric M. Bernstein & Associates, LLC
34 Mountain Boulevard, Building A
Warren, New Jersey 07059-4922

   Re: 103 Park Assoc LLC c/o River Co v. Montclair Township
     <u>Docket Nos. 008196-2021 and 006183-2023</u>

Dear Mr. Spiotti and Mr. DiYanni:

This letter constitutes the court's opinion following trial of the above local property tax appeals. 103 Park Associates, LLC ("103 Park Associates") challenges the 2021 and 2023 tax assessments on its property in Montclair Township ("Montclair"), New Jersey.

For the reasons stated below, the court affirms the 2021 and 2023 tax year assessments.

## I. <u>Procedural History and Findings of Fact</u>

As of the valuation dates at issue, 103 Park Associates was the owner of the property at 103 Park Avenue, Montclair, New Jersey. The subject property is identified on Montclair's tax map as block 2312, lot 27 (the "subject property").

The subject property is improved with two buildings comprising multiple office tenants. The front building was formerly a single-family residence, and the rear building formerly served as the carriage house to the residence. The buildings were constructed in approximately 1870, and were renovated and converted to office buildings in or about the 1980's.






The subject property is located along the east side of Park Street, between Walnut Street and Chestnut Street. The property has a rectangular shaped lot comprising approximately 0.63-acres. The lot has 125 feet of frontage along Park Street and a depth of 220 feet. The lot is level with the grade of Park Street and slopes downwards towards the rear, resulting in the front building's basement being partially below grade and partially at grade level. The site contains parking for approximately forty-two vehicles. The subject property is close to Montclair's Bloomfield Avenue, Walnut Street, and Watchung Plaza business districts. The property is serviced by public utilities, including municipal sewer and water, natural gas, and electric.

During trial, 103 Park Associates and Montclair each offered testimony from a New Jersey certified general real estate appraiser, who the court accepted as experts in the field of real property valuation.[1] Each expert prepared an appraisal report containing photographs of the subject property and expressing opinions of the subject property's true or fair market value. As of each valuation date, the subject property's local property tax assessment, implied equalized value, and the experts' value conclusions are set forth below:

| Valuation date | Tax assessment | Average ratio of assessed to true value | Implied equalized value | 103 Park Associates' expert | Montclair's expert |
|---|---|---|---|---|---|
| 10/1/2020 | $1,629,800 | 88.05% | $1,850,994 | $1,270,000 | $2,325,000 |
| 10/1/2022 | $1,629,800 | 72.47% | $2,248,931 | $1,230,000 | $2,190,000 |

103 Park Associates timely filed complaints challenging the subject property's 2021 and 2023 tax year assessments. Montclair filed a counterclaim for the 2023 tax year. The court tried these matters to conclusion over one day.

The subject property's front building is a three-story wood-frame building with vinyl

---

[1] Counsel for 103 Park Associates and Montclair each stipulated to the qualifications of the other party's appraiser as an expert in the real property valuation field.






siding, comprising approximately 8,004 gross square feet. The front building has approximately 7,363 net rentable square feet of office space (including approximately 1,596 net rentable square feet of partially below grade office space).[2]

The front building is serviced with a fully automatic four stop passenger elevator. The front building has three entrances, the first, along the front of the building (which is the dedicated entrance for only one tenant), the second, located along the north side of the building (which serves as the main entrance to the building), and the third, along the rear of the building (which serves as the dedicated entrance for the basement tenants).

The front building's interior is finished with painted plaster and sheetrock walls and partitions, commercial grade wall-to-wall carpeting, recessed high-hat lighting, and suspended grid-type composition tile ceilings. The restrooms feature vinyl tile or linoleum floor coverings, painted sheetrock walls, and standard plumbing fixtures.

The front building is principally comprised of several bedroom-sized rooms that are leased as separate independent offices. The rooms are accessed by a central hallway, which also provides access to the shared bathrooms. The court's review of the subject property's rent roll and signage

---

[2] 103 Park Associates' expert and Montclair's expert agreed that the front building contains 6,408 gross square feet of above grade office space. Montclair's expert estimated that the front building has a net rentable area of 5,767 square feet of above grade office space. In addition, in Montclair's expert's opinion, the front building's basement contains approximately 1,596 square feet of net rentable office space. In 103 Park Associates' expert's opinion, the front building's basement contains approximately 1,700 net rentable square feet. Based on the evidence provided, the court finds that the front building consists of 7,363 net rentable square feet of office space (5,767 square feet above grade + 1,596 square feet below grade = 7,363 square feet). Montclair's expert testified that he personally measured the outside dimensions of the front building and rear building with cloth tape to determine its gross square footage. In contrast, 103 Park Associates' expert did not measure the buildings, instead, an appraiser associated with his office apparently measured the buildings. However, no sketch containing the measurements was in his appraisal report or in his work file. Thus, the court found Montclair's expert's measurements to be more credible.






discloses that most of the front building's tenants are comprised of a mix of licensed social workers, licensed clinical social workers, PhD's, licensed professional counselors, and behavioral and wellness service providers.

The rear building is a two-story wood-frame building with vinyl siding comprising approximately 1,940 net rentable square feet (excluding approximately 500 square feet of finished below grade office space).[3]

The rear building's interior is finished with a ceramic tile entryway, commercial grade wall-to-wall carpeting, sheetrock walls, suspended grid-type composition tile ceilings, and recessed high-hat lighting. The restrooms feature linoleum floor coverings, painted sheetrock walls, and standard plumbing fixtures. The first and second floor of the rear building are each individually metered for electric and natural gas.

The rear building is occupied by a physician's medical practice, and contains patient examination rooms, a reception area, offices, and a patient waiting area.

According to the experts, the tenants in the front building and rear building lease their space under modified gross lease arrangements, where each tenant bears responsibility for their own utility costs. Montclair's expert further expressed that each unit has its own gas fired package HVAC system with an exterior compressor.

The subject property is in Montclair's OR-3 Garden Apartment and Office Building zoning district with permitted principal uses that include, the uses permitted under the R-3 Garden Group zoning district, business offices and professional offices (excluding banks), and senior citizen

---

[3] In 103 Park Associates' expert's opinion, the rear building contains approximately 1,600 rentable square feet of office space. In Montclair's expert's opinion, the rear building contains approximately 1,940 rentable square feet of office space. For substantially the same reasons set forth in footnote 2 above, the court finds Montclair's expert's measurements more credible.






housing. Thus, use of the subject property as multi-tenanted office buildings is a legally permitted and conforming use. The subject property is in Flood Hazard Area X, denoting an "area[] of minimal flood hazard."[4]

## II. Conclusions of Law

### A. Presumption of validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic Cty., 100 N.J. 408, 413 (1985). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. See Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the plaintiff's proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be

---

[4] https://www.fema.gov/glossary/flood-zones.






'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. East Orange City, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. Summit City, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

Hence, even in the absence of a motion to dismiss under R. 4:37-2(b), the court is nonetheless required to determine if the party challenging the tax assessments has overcome the presumption of validity. If the court concludes that the challenging party has not carried its burden, dismissal of the actions is warranted under R. 4:40-1, and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

Here, affording 103 Park Associates all reasonable inferences that could be deduced from the evidence, the court finds that 103 Park Associates produced cogent evidence sufficient to overcome the presumption of validity. 103 Park Associates' expert's opinions, if accepted by the court as true, raise debatable questions as to the validity of the subject property's tax assessments.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that the local property tax assessments are erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of






correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer

. . . to demonstrate that the judgment [or local property tax assessment] under review was

incorrect." Id. at 314-15 (citing Pantasote Co., 100 N.J. at 413).

> B. Highest and best use

"For local property tax assessment purposes, property must be valued at its highest and

best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). The highest

and best use analysis is a concept rooted in the market's perceptions of value because it answers

the inquiry, "[w]hat use would the market make of that property?" Ford Motor Co., 127 N.J. at

302 (citation omitted). To accurately answer that question, an appraiser must conduct "a

comprehensive market analysis to ascertain the supply and demand characteristics of alternative

uses." Clemente, 27 N.J. Tax at 269. Thus, the highest and best use analysis is the starting point

in the court's journey to discern a property's true or fair market value. See Ford Motor Co. v.

Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988) (concluding that the highest and best use analysis

is "the first and most important step in the valuation process").

Here, 103 Park Associates' expert concluded that the subject property's highest and best

use, as vacant, is for a commercial use, and as improved, is for its present use as multi-tenanted

office buildings. Montclair's expert similarly concluded that the subject property's highest and

best use, as vacant, is for mixed use (office and multi-family residential) or multi-family

residential, and as improved, is for its present use as multi-tenanted office buildings. The court

finds that the subject property's highest and best use, as vacant, is for a commercial use, as offices

or a commercial/residential mixed use in accordance with applicable zoning laws, and as

improved, is for its present use as multi-tenanted office buildings.






C.    Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Glen Rock Borough, 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (internal citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)).

Here, both 103 Park Associates' expert and Montclair's expert concluded, and the court agrees, that the income capitalization approach is the most appropriate method to derive the subject property's estimated true or market value.[5]

1.    Income capitalization approach

When a property is income-producing, the income capitalization approach is the "preferred method for estimating the value of income producing property." Forsgate Ventures IX, L.L.C. v. Twp. of South Hackensack, 29 N.J. Tax 28, 46 (Tax 2016), aff'd, 31 N.J. Tax 135 (App. Div. 2018). "The income capitalization approach to value consists of methods, techniques, and

---

[5] As a check on his concluded market value, Montclair's expert testified that he also analyzed the subject property against four office building sales in Montclair. Montclair's expert testified that the comparable office sales were all located in the subject property's market, sold between February 2021 and August 2022, and bore sale price of $204.78 to $353.26 PSF.






mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert[s] these benefits into an indication of present value." Appraisal Institute, The Appraisal of Real Estate, 439 (14th ed. 2013).

Fundamental to the income capitalization approach is the concept of anticipation, a process designed to forecast future economic benefits and convert those benefits into a present value estimate. Id. at 440. In essence, the income capitalization approach converts the anticipated stream of a property's income and the reversionary benefit into a present value. First Republic Corp. of Am. v. E. Newark Borough, 16 N.J. Tax 568, 578 (Tax 1997) (stating that the value of "income-producing real estate is based on the income it will produce in the future . . . the principle of anticipation, [is] the present worth of future benefits").

a.  Economic or market rent

In undertaking the income-capitalization approach, an appraiser is charged with the responsibility of determining a property's potential gross income. This requires an appraiser to discern "the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Vill. Apartments Co. v. Cranford Twp., 108 N.J. 266, 270 (1987). The term economic or market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." Appraisal Institute, The Dictionary of Real Estate Appraisal, 121-22 (5th ed. 2010). By accurately determining a property's economic or market rent, an appraiser can forecast the anticipated revenue stream to be generated by that property and convert that future income stream into a present value. First Republic Corp. of Am., 16 N.J. Tax at 578.






At the outset, the court highlights that both 103 Park Associates' expert and Montclair's expert separated the subject property into two categories: (i) above grade office space; and (ii) below grade office space. The experts expressed that, in general, below grade office space is less desirable, and thus, commands a lower market or economic rent than above grade office space.[6]

i.      103 Park Associates' expert

To discern a market or economic rent for the above grade office space in the subject property, 103 Park Associates' expert identified seven comparable office leases. The office leases were identified as follows:

| Lease | Address | Lease date | Leased area | Rent PSF | Lease Type |
|---|---|---|---|---|---|
| 1 | 123 Highland Avenue Glen Ridge, NJ | March 2018 | 1,442 sq. ft. | $28.80 | Modified gross |
| 2 | 546 Valley Road Upper Montclair, NJ | April 2018 | 1,793 sq. ft. | $27.55 | Gross |
| 3 | 546 Valley Road Upper Montclair, NJ | June 2019 | 1,140 sq. ft. | $27.10 | Gross |
| 4 | 123 Highland Avenue Glen Ridge, NJ | October 2019 | 1,931 sq. ft. | $25.00 | Modified gross |
| 5 | 123 Highland Avenue Glen Ridge, NJ | July 2020 | 3,158 sq. ft. | $25.03 | Modified gross |
| 6 | 250-254 Bellevue Avenue Montclair, NJ | April 2022 | 1,800 sq. ft. | $25.88 | Modified gross |
| 7 | 250-254 Bellevue Avenue Montclair, NJ | April 2022 | 1,800 sq. ft. | $25.88 | Modified gross |

As of the October 1, 2020 valuation date, 103 Park Associates' expert relied on leases 1, 2, 3, 4, and 5. As of the October 1, 2022 valuation date, 103 Park Associates' expert relied on leases 4, 5, 6, and 7.

103 Park Associates' expert applied downward adjustments of 5% and 6% ($1.50 PSF),

---

[6] The experts agreed that the above grade office leases in the front building would not produce an accurate assessment of economic or market rent. Because the front building is principally rented to tenants that occupy single room offices with shared common hallways and bathrooms, the experts expressed that the rent ascribed to each single room office would not be representative of office rents in the Montclair marketplace.






respectively, to lease 2 and lease 3, to account for the estimated difference between a gross lease and modified gross lease. 103 Park Associates' expert applied no other adjustments to his leases.

After applying his adjustments, 103 Park Associates' expert's range of adjusted market rents for the above grade office space was $25.00 to $28.60 PSF, as of the October 1, 2020 valuation date, and $24.70 to $25.88 PSF, as of the October 1, 2022 valuation date. Ultimately, 103 Park Associates' expert concluded a market or economic rent of $25.00 PSF, for the subject property's above grade office space as of the October 1, 2020, and October 1, 2022 valuation dates.

To discern the market or economic rent for the subject property's below grade office space, 103 Park Associates' expert applied a 15% downward adjustment to his concluded market or economic rent of the above grade office space. Based on an examination of the subject property's leases, 103 Park Associates' expert opined that a 15% adjustment accounted for the difference between above grade and below grade office space. Thus, 103 Park Associates' expert concluded an economic or market rent of $21.00 PSF for the subject property's below grade office space.

ii.     Montclair's expert

To discern the market or economic rent for the subject property's above grade office space, Montclair's expert identified five comparable office leases. The office leases were identified as follows:

| Lease | Address | Lease date | Leased area | Rent PSF | Lease Type |
|---|---|---|---|---|---|
| 1 | 70 Park Street Montclair, NJ | June 2016 | 800 sq. ft. | $27.00 | Modified gross |
| 2 | 52 Fairfield Street, Montclair, NJ | December 2017 | 2,431 sq. ft. | $33.46 | Modified gross |
| 3 | 325 Clairemont Avenue Montclair, NJ | December 2020 | 1,482 sq. ft. | $46.55 | Modified gross |
| 4 | 325 Clairemont Avenue Montclair, NJ | March 2021 | 1,018 sq. ft. | $40.53 | Modified gross |
| 5 | 325 Clairemont Avenue Montclair, NJ | August 2021 | 1,250 sq. ft. | $41.42 | Modified gross |

Montclair's expert relied on all five comparable leases, as of the October 1, 2020, and






October 1, 2022 valuation dates to arrive at his market or economic rent for the subject property's above grade office space.

Montclair's expert applied a downward adjustment of 10% to lease 3, lease 4, and lease 5, to account for that leased property being newly renovated and in superior condition. Montclair's expert applied no other adjustments to the comparable leases.

After applying his adjustments, Montclair's expert's range of adjusted market rents for the above grade office space was $27.00 to $41.90 PSF, as of the October 1, 2020 and October 1, 2022 valuation dates. Montclair's expert concluded a market rent of $35.00 PSF, for the above grade office space in subject property as of the October 1, 2020 and October 1, 2022 valuation dates.

However, to discern the market or economic rent for the subject property's below grade office space, Montclair's expert relied on one of the subject property's below grade office leases. That lease bore a May 1, 2022 commencement date and had an average rental rate of $24.62 PSF, on a modified gross basis. Montclair's expert accepted that lease and ascribed an economic or market rent of $24.62 PSF to the subject property's below grade office space.

iii.     Court's analysis

At the outset, the court emphasizes that the weight to be accorded expert testimony "depends upon the facts and reasoning which form the basis of the opinion. An expert's conclusion can rise no higher than the data providing the foundation." Inmar Associates, Inc., 2 N.J. Tax at 66 (citing City of Passaic v. Gera Mills, 55 N.J. Super. 73 (App. Div. 1959)). Thus, for the opinions of an expert to be of any import, the expert is required to "identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are scientifically reliable." Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992). Without an adequate explanation of the basis, "the opinion of the expert is entitled to little weight.

   

. . ." Dworman v. Tinton Falls Bor., 1 N.J. Tax 445, 458 (Tax 1980).  Additionally, "this court has not only the right, but the duty, to apply its own judgment to valuation data submitted to it by experts in order to arrive at a true value and fix an assessment for the tax years in question." Lamm Associates v. Borough of West Caldwell, 1 N.J. Tax 373, 387-388 (Tax 1980) (citing Samuel Hird and Sons, Inc., 87 N.J. Super. 65).

Here, the court does not find that 103 Park Associates' expert's comparable lease 1, comparable lease 4, and comparable lease 5, to be credible evidence of the subject property's economic or market rent.  The leased location of this office building is in Glen Ridge, New Jersey, while the subject property is in Montclair.  In addition, the office building in which 103 Park Associates' expert's comparable lease 1, comparable lease 4, and comparable lease 5, are located is close to the Hackensack Meridian Mountainside Medical Center.  Thus, the court finds that its location near the Hackensack Meridian Mountainside Medical Center may impact or affect its rental values.

The court accepts 103 Park Associates' expert's adjustments and adjusted rents to his lease comparable lease 2 ($26.05 PSF), comparable lease 3 ($25.60 PSF), comparable lease 6 ($25.88 PSF), and comparable lease 7 ($24.70 PSF).  In addition, the court accepts Montclair's expert's adjustments and adjusted rents to his comparable lease 1 ($27.00 PSF); comparable lease 2 ($33.46 PSF); comparable lease 3 ($41.90 PSF); comparable lease 4 ($36.48 PSF); and comparable lease 5 ($37.28 PSF).  The range of adjusted rents is $24.70 to $41.90 PSF, with a median of $27.00 and mean of $30.93.  The court emphasizes that it places the greatest weight on Montclair's expert's comparable lease 1 ($27.00 PSF) and Montclair's expert's comparable lease 2 ($33.46 PSF), as those properties are closest to the subject property, and are either within or close to the Bloomfield Avenue, Walnut Street, and Watchung Plaza business districts, like the subject property.






Accordingly, the court finds that an economic or market rent of $30.00 PSF, should be ascribed to the subject property's above grade office space.

Finally, the court does not find 103 Park Associates' expert's application of a 15% downward adjustment to his derived above grade office space rent either appropriately, or accurately reflects the market or economic rent for below grade office space in Montclair. Rather, the court accepts the subject property's actual lease of below grade office space as more credible and reliable evidence of its market or economic rent. Therefore, the court accepts Montclair's expert's $24.62 PSF concluded market or economic rent for the subject property's below grade office space.

b.    Vacancy and collection loss factor

Here, in reaching the concluded vacancy and collection loss factor to be applied to the subject property's reconstructed operating statement's potential gross income, both 103 Park Associates' expert and Montclair's expert analyzed the subject property's rent rolls and published data from CoStar within the Urban Essex Office Submarket for the 3rd Quarter 2020, and 3rd Quarter 2022.

After reviewing that data and information, both experts concluded that a ten percent (10%) vacancy and collection loss factor was reasonable and applied that vacancy and collection loss factor to their reconstructed operating statements.

The court finds that the evidence supports the experts' concluded vacancy and collection loss factor. Accordingly, the court will apply a ten percent (10%) vacancy and collection loss factor to the subject property's gross potential income for all tax years at issue.

c.    Tenant improvement allowance

In "certain real estate markets, space is rented to a new tenant only after substantial interior






improvements are made." Hull Junction Holding Corp., 16 N.J. Tax at 106 (quoting Appraisal Institute, The Appraisal of Real Estate, 450 (10th ed. 1992)). When these improvements are incurred at the landlord's expense and are necessary to realize market rent, they are referred to as tenant improvement/fit-up allowances. Often, the cost of a tenant improvement allowance is built into the rental rate and amortized by the landlord over the lease term. The Appraisal of Real Estate, at 474.

In 103 Park Associates' expert's opinion, tenant improvement allowances are customary for office buildings operated in the subject property's market area. In 103 Park Associates' expert's opinion, a tenant improvement allowance of $1.50 PSF should be accounted for on the subject property's reconstructed operating statement.

However, effective cross-examination disclosed that although some of 103 Park Associates' expert's comparable leases were afforded a nominal period of free rent, none of the comparable leases provided any tenant improvement or fit-up allowance.[7] Thus, although 103 Park Associates' expert maintained that tenant improvement allowances are customary in the Montclair office marketplace, none of the comparable leases that he relied on to determine the subject property's market or economic rent afforded any tenant improvement allowance. Moreover, the court's review of the operating statements furnished by 103 Park Associates' expert in support of his proposed stabilized expenses disclosed that none of the four properties reported a tenant improvement or fit-up allowance on their annual operating statements.[8]

---

[7] 103 Park Associates' expert's comparable lease 2 was given 1½ months free rent, comparable lease 3 was given 1½ months free rent, and comparable lease 6 was given 1-month free rent.
[8] In 103 Park Associates' expert's opinion, this was not because a tenant improvement allowance was not given, but rather due to the classification of tenant improvement expenses as maintenance and repair expenses on the operating statements. However, the court emphasizes that only two of the properties identified by 103 Park Associates' expert as comparable for purposes of discerning


Interpreter


ADA
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



Conversely, Montclair's expert testified that based on his discussions with 103 Park Associates' representative, the subject property's offices are "delivered as a vanilla box, and any kind of improvements that they [103 Park Associates] were doing would be limited to painting or some minor floor coverings." Moreover, except for his comparable lease 2, none of Montclair's expert's comparable leases afforded any tenant improvement allowance. In addition, Montclair's expert testified that the tenant improvement allowance afforded under his comparable lease 2 was limited to interior painting and repair of an air conditioning unit. Thus, Montclair's expert reasoned that based on his review of the subject property's leases, which disclosed that only nominal allowances were afforded for things like interior painting and carpeting, and examination of his five comparable leases, no tenant improvement allowance should be afforded to the subject property.

The court finds the comparable lease data, and Montclair's expert's testimony on this issue to be credible. Excepting Montclair's expert's comparable lease 2, none of the comparable leases offered by 103 Park Associates' expert or Montclair's expert demonstrated that a tenant improvement or fit-up allowance is afforded in the marketplace. Moreover, the tenant allowance provided under Montclair's expert's comparable lease 2 was nominal. Accordingly, although 103 Park Associates' expert opined that tenant improvement allowances are customary in the subject property's market area, he offered no empirical data or evidence supporting such opinion. Accordingly, the court declines to apply a tenant improvement allowance or deduction to the subject property's effective gross income.

---

the subject property's operating expenses were in Essex County. Further, although 103 Park Associates' expert used five leases from those two Essex County properties in his comparable lease analysis to discern economic or market rent, none of those five comparable leases offered a tenant improvement allowance.






          d.     <u>Stabilization</u>

Stabilization "involves elimination of abnormalities or any additional transitory conditions from stated income or expenses to reflect conditions that are expected to continue over the economic life of the property." <u>First Republic Corp. of America</u>, 16 N.J. Tax at 579 (Tax 1997) (citing <u>The Dictionary of Real Estate Appraisal</u>, 344-45 (3rd ed. 1993)).  Consistent with that principle, under the income capitalization approach, an appraiser must perform a "comprehensive analysis of the annual expenses" and income of the property being appraised.  <u>The Appraisal of Real Estate</u>, at 453.  As part of that analysis, an appraiser prepares a reconstructed operating statement to "reflect the potential future performance of a property, considering the historical income and expenses of an investment property." <u>Ibid</u>.  Through an examination and analysis of a property's historical income and expense data, when measured against comparable properties in the marketplace, an appraiser can discern the potential future performance of the property over its economic life.

Here, both experts concluded that a stabilized structural reserve expense of two percent (2%) of effective gross income was reasonable.  The court finds that the evidence supports the experts' conclusions.  Accordingly, the court will accept and apply a two percent (2%) structural reserve expense to the subject property's effective gross income for all tax years at issue.

In addition to the tenant improvement allowance and structural reserve expense identified above, in 103 Park Associates' expert's opinion, the following expenses should be stabilized and deducted from the subject property's effective gross income: (i) a management fee expense of 5%; (ii) a leasing commission expense of 5%; (iii) an administration fee of $0.30 PSF; (iv) utility costs of $0.60 PSF; (v) maintenance and repair expenses of $2.75 PSF; (vi) security expense of $0.07 PSF; and (vii) miscellaneous expenses of 1%.  To determine these amounts, 103 Park Associates'






expert reviewed Institute of Real Estate Management (IREM) published data, the subject property's operating statements, and the operating statements of four office buildings that he viewed as comparable to the subject property.[9]

Conversely, in Montclair's expert's opinion, in addition to the structural reserve expense identified above, Montclair's expert concluded that the following expenses should be stabilized and deducted from the subject property's effective gross income: (i) a management fee expense of 4%; (ii) a leasing commission expense of 3%; and (iii) general operating expenses of $5.00 PSF. To determine these amounts, Montclair's expert examined the subject property's operating expenses and data reported by CoStar for one and two star categorized office buildings in the Northern New Jersey market and Newark/Urban Essex and West Essex submarkets.[10]

At the outset, the court highlights that the four comparable office buildings used by 103 Park Associates' expert to derive his stabilized expenses are traditionally constructed and operated office buildings. Moreover, one of those buildings, 546 Valley Road, Montclair, was the source of 103 Park Associates' expert's comparable lease 2 and comparable lease 3, which were leased on a gross lease basis, not on a modified gross lease basis. Thus, the court finds any reliance on the reported utility expenses of that building would be misplaced, as the owner of that building is responsible for a greater share of the operating expenses.

Importantly, the court finds that a review of the subject property's operating statements is critical to accurately gauging the stabilized expenses associated with operating the subject property. Notably, the court highlights that the subject property's reported utility expenses of

---

[9] 103 Park Associates' expert did not attach a copy of the IREM reports to his appraisal report thus, the court was unable to discern the reporting period for these expenses.

[10] Montclair's expert testified that he averaged the expenses reported in the CoStar report, excluding the real estate tax portion, to discern a $5.00 PSF stabilized expense.




Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



approximately $0.60 PSF were between $1.09 to $2.91 PSF less than the four comparable properties identified by 103 Park Associates' expert. In addition, the subject property's reported insurance expenses were between $0.38 to $0.54 PSF greater than the four comparable properties identified by 103 Park Associates' expert and were $0.70 PSF higher than the IREM reported data.

After considering the experts' testimony, reviewing the subject property's operating statements, the comparable office building data, and evaluating the CoStar Northern New Jersey Office Newark/Urban Essex and West Essex submarket and IREM data, the court finds that the following stabilized expenses should be attributed to the subject property: (i) a management/administration fee expense of 5% of EGI[11]; (ii) a leasing commission expense of 3% of EGI[12]; (iii) utility costs of $0.60 PSF[13]; (iv) maintenance and repair expenses of $2.75 PSF; (v) insurance costs of $0.29 PSF;[14] and (vi) replacement reserves of 2% of EGI.

---

[11] The subject property reported management expenses of $4,800, and administration expenses (alarm monitoring, elevator inspection, accounting, annual reports, building supplies, and telephone) of $6,415, or $1.13 PSF, for the year ending December 2020; management expenses of $5,100 and administration expenses (alarm monitoring, elevator inspection, accounting, annual reports, building supplies, and telephone) of $11,221, or $1.64 PSF, for the year ending December 2021; and management expenses of $5,100, and administration expenses (alarm monitoring, elevator inspection, accounting, annual reports, building supplies, and telephone) of $925, or $0.61 PSF, for the year ending December 2022. IREM reported management fee expenses of $0.55 PSF, and administration expenses of $0.81 PSF, or $1.36 PSF. A stabilized management/administration fee for the subject property of 5% of EGI is equivalent to approximately $1.22 PSF.

[12] Testimony was elicited during trial that the subject property's single room offices are generally leased by the owner or by word of mouth and without the assistance of a realtor. Moreover, a review of 103 Park Associates' operating statements does not disclose that any real estate commissions were paid by 103 Park Associates during 2020, 2021, or 2022 years. The court finds that a 3% stabilized leasing commission would accurately account for any leasing commission expense that would be incurred by 103 Park Associates to relet the subject property.

[13] Which reflects 103 Park Associates' expert's proposed stabilized utility expense, and the subject property's average actual utility expenses over a six-year period.

[14] The court's review of CoStar's Northern New Jersey Office reported Newark/Urban Essex and West Essex submarket data disclosed a $0.29 PSF insurance expense.






e.  Capitalization

The direct capitalization approach "convert[s] an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." The Appraisal of Real Estate, at 491; Hull Junction Holding Corp., 16 N.J. Tax at 80-81. Thus, the capitalization rate is the device that converts a property's net operating income into an estimate of value.

Here, to derive their capitalization rates, 103 Park Associates' expert and Montclair's expert both undertook a review of data, including investor surveys, and published capitalization rates.[15] Both experts employed the band of investment technique to derive a capitalization rate.[16]

103 Park Associates' expert concluded the following base capitalization rates: (i) 7.00%, as of the October 1, 2020 valuation date (3.75% interest rate, 60% loan-to-value ratio, twenty-five (25) year amortization period, and 8.25% equity dividend rate[17]); and (ii) 7.70%, as of the October 1, 2022 valuation date (5.00% interest rate, 60% loan-to-value ratio, twenty-five (25) year amortization period, and 8.75% equity dividend rate).

Montclair's expert concluded the following base capitalization rates: (i) 6.04%, as of the October 1, 2020 valuation date (4.50% interest rate, 70% loan-to-value ratio, twenty-five (25) year amortization period, and 4.57% equity dividend rate); and (ii) 6.712%, as of October 1, 2022 valuation date (4.50% interest rate, 70% loan-to-value ratio, twenty-five (25) year amortization

---

[15]  Both experts relied on ACLI, PwC/Korpacz, and Situs/RERC surveys.

[16]  The band of investment technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.' The technique includes both a mortgage and an equity component." Hull Junction Holding Corp., 16 N.J. Tax. at 80-81 (quoting Appraisal Institute, The Appraisal of Real Estate, 467 (10th ed 1992)).

[17]  103 Park Associates' expert refers to this as an Equity Capitalization Rate.






period, and 6.81% equity dividend rate).

The court's own review and analysis of the data reveals that, as of the October 1, 2020 valuation date: (i) the ACLI bulletin reported office building interest rates from 3.36% to 3.79%, loan-to-value ratios of 56% to 64%, and capitalization rates of 4.29% to 6.98%; (ii) 30-year Treasury yields were 2.35%, with an average extracted equity yield of 4.17%; (iii) PwC's National Suburban Office Market capitalization rates were 4.00% to 7.50%, with an average of 6.05%; and (iv) RERC's East Second-Tier Investment Properties Central Business District office equity dividend rates were 6% to 9.5%, and Suburban Office equity dividend rates were 5% to 9.5%.[18]

In addition, the court's review and analysis of the data reveals that, as of the October 1, 2022 valuation date: (i) the ACLI bulletin reported office building interest rates from 4.66% to 5.52%, loan-to-value ratios of 49% to 74%, and capitalization rates of 4.96% to 7.33%; (ii) 30-year Treasury yields were 3.79%, with an average extracted equity yield of 5.09%; (iii) PwC's National Suburban Office Market capitalization rates were 4.25% to 7.5%, with an average of 5.97%; and (iv) RERC's East Second-Tier Investment Properties Central Business District office equity dividend rates were 6.3% to 10%, and Suburban Office equity dividend rates were 6.5% to 11%.[19]

Moreover, according to a local bank consulted by Montclair's expert, as of the October 1, 2020 valuation date, the bank was offering interest rates for office buildings in the range of 4.25% to 4.75%, with amortization periods of 25 to 30 years and loan-to-value ratios of 70% to 75%. In addition, as of October 1, 2022 valuation date, the bank was offering interest rates for office buildings in the range of 3.875% to 4.75%, with amortization periods of 25 to 30 years and loan-

---

[18]  According to 103 Park Associates' expert's appraisal report.
[19]  According to 103 Park Associates' expert's appraisal report.






to-value ratios of 70% to 75%.

Accordingly, based on a review of the above data and information, as well as the experts' testimony and opinions, the court finds that, as of the October 1, 2020 valuation date, Montclair's expert's 70% loan-to-value ratio is credible, both experts' concluded twenty-five (25) year amortization period is reasonable, and that a 4.25% interest rate and a 5.00% equity dividend rate should be applied. Additionally, the court finds that, as of the October 1, 2022 valuation date, Montclair's expert's 4.50% interest rate, 103 Park Associates' expert's 60% loan-to-value ratio, and both experts' concluded twenty-five (25) year amortization period are reasonable, and a 6.50% equity dividend rate should be applied.

Thus, the base capitalization rate, as of the October 1, 2020 valuation date should be 6.051% (4.25% interest rate, 70% loan-to-value ratio, twenty-five (25) year amortization period, and 5.00% equity dividend rate). In addition, as of the October 1, 2022 valuation date, the base capitalization rate should be 6.60% (4.50% interest rate, 60% loan-to-value ratio, twenty-five (25) year amortization period, and 6.50% equity dividend rate) should be employed.

After adding the effective tax rate, the loaded capitalization rate is: (i) as of the October 1, 2020 valuation date is 8.895% (6.051% + 2.844% = 8.895%); and (ii) as of the October 1, 2022 valuation date is 9.047% (6.60% + 2.447% = 9.047%).

Accordingly, the subject property's reconstructed operating statement for the 2021 and 2023 tax years is set forth below:






**2021 and 2023 Tax Years**

INCOME:

Front building

| | | |
|---|---|---|
| 5,767 net rentable square feet @ $30.00 PSF (above grade office) | | $173,010 |
| 1,596 net rentable square feet @ $24.62 PSF (below grade office) | | $ 39,294 |

Rear building

| | | |
|---|---|---|
| 1,940 net rentable square feet @ $30.00 PSF (above grade office) | | $ 58,200 |
| TOTAL: | Potential Gross Income (PGI) | $270,504 |
| LESS: | Vacancy & Collection loss @ 10.00% PGI | ($ 27,050) |
| Total: | Effective Gross Income | $243,454 |

STABILIZED EXPENSES:

| | | | |
|---|---|---|---|
| Utilities | 9,944 sq. ft. | @ $0.60 PSF | $ 5,966 |
| Maintenance and Repairs | 9,944 sq. ft. | @ $2.75 PSF | $27,346 |
| Insurance | 9,944 sq. ft. | @ $0.29 PSF | $ 2,884 |
| Leasing Commissions | | @ 3% of EGI | $ 7,304 |
| Management/Administration | | @ 5% of EGI | $12,173 |
| Replacement Reserves | | @ 2% of EGI | $ 4,869 |
| Total: | | | ($ 60,542) |

NET OPERATING INCOME: $182,912

2021 CAPITALIZATION RATE & EFFECTIVE TAX RATE: 6.051% + 2.844% = 8.895%
2021 LOADED CAPITALIZATION RATE:     8.895%
2021 CONCLUDED VALUE:     $182,912 / .08895     $2,056,346

2023 CAPITALIZATION RATE & EFFECTIVE TAX RATE: 6.60% + 2.447% = 9.047%
2023 LOADED CAPITALIZATION RATE:     9.047%
2023 CONCLUDED VALUE:     $182,912 / .09047     $2,021,797

Accordingly, the court finds the subject property's true or fair market value to be: (i) $2,056,000, as of the October 1, 2020 valuation date; and (ii) $2,022,000, as of the October 1, 2022 valuation date.

2.     Corrected Local Property Tax Assessment

Having reached conclusions of the subject property's true or fair market value, the court will turn its attention to determining the subject property's correct tax assessments for the 2021 and 2023 tax years.






Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b).

For the 2021 tax year, the ratio of assessed value, $1,629,800, to true market value, $2,056,000, yields a ratio of 79.27% ($1,629,800/$2,056,000 = 79.27%), which falls between Montclair's upper limit (100%) and lower limit (74.84%) of the Chapter 123 common level range. Consequently, no reduction or increase in the subject property's 2021 local property tax assessment is warranted.

For the 2023 tax year, the ratio of assessed value, $1,629,800, to true market value, $2,022,000, yields a ratio of 80.60% ($1,629,800/$2,022,000 = 80.60%), which falls between Montclair's upper limit (94.92%) and lower limit (70.16%) of the Chapter 123 common level range. Consequently, no reduction or increase in the subject property's 2023 local property tax assessment is warranted.

Accordingly, contemporaneous herewith the court shall enter judgments affirming the subject property's 2021 and 2023 local property tax assessments.

Very truly yours,


Hon. Joshua D. Novin, J.T.C.




